Simmons v. Henghold Thank you, Your Honors. Eric Galichka for the appellant, Emily Simmons. As this Court is aware, this is an appeal from a summary judgment at the district court level on an FMLA interference claim. The issues before this Court is whether the summary judgment was proper in that was there sufficient factual dispute as to whether the appellant was returning to an equivalent position to survive summary judgment. And then the second issue was the alternative ruling of the district court, which is, did the record establish undisputably under the Rodrigo standard and unequivocally under the Turner standard of the Eleventh Circuit that appellees would have made the decision to hire a chief nursing officer who took over appellate's administrative duties before the appellate took FMLA leave. And that's a position that the appellee has taken multiple times in their appellate brief. As to whether the appellant was returning to an equivalent position, we look at 29 CFR 825.15. Appellee's focused on the fact that she returned to a position that had the same salary, benefits, hours. But 825.15 goes on to talk about what is an equivalent position. And what it says is it has to be virtually identical, not only on the compensation side, benefits side, but also to a position that has equivalent skill, effort, responsibility, and authority. Did your client lose supervision over hiring of nurses? Absolutely. And you can look at the record in multiple places. And I would start out with there was a September 1, 2016, raise that she received in an accompanying memorandum from the CEO as to what her responsibilities were. And one of them was including the hiring and firing of nursing. Now, this practice had multiple facilities. It had an ambulatory surgical center. It had a main office building adjacent to the surgical center. And it had two off-site facilities, one in Pensacola, one in Gulf Breeze. She was responsible for all the nursing, management of the nurses in all those facilities prior to her taking FMLA leave. And that's pursuant to that memorandum of September 1, 2016, which was discussed with the CEO in her deposition. And at that time, and if you look at particularly, I apologize, I have to take my glasses off to read. If you look at Appendix 2 at 27-4, pages 78 through 81, which came directly off this newly created chief nursing officer's job description. And we asked did the appellant do these jobs back in 2016? And the answer was yes to 90 percent of the jobs that we lifted off the job description she later created for the CNO. And what's important about that is then you go to the evaluation at the end of December where the evaluation said that she exceeded all her expectations that were set for her back in September. So yes, she was doing all these. Then you look at Ms. Saul's deposition. She's the CNO that they hired to replace my client after she took FMLA leave. And I would invite the Court to look at Appendix 4 at tabs 27-7, and specifically at page 35, she goes through what her actual duties were. So you take her deposition testimony at that page, along with Huss's deposition that I cited too, and then you look at what Ms. Simmons testified to as her actual job duties. And those appear at Appendix 1 at 27-1, pages 55 through 73. And you can see that there were job duties that Ms. Saul took that my client did prior to her FMLA. Easy explanation of it is when you look at all the facilities, everybody agreed that when she came back from FMLA leave, the only facilities my client would be responsible for were the ambulatory surgical center and possibly the MOB. She was relieved completely of all her nursing responsibilities for the outlying facilities. And that's something that is not referenced in the summary judgment order. But the specific citations I gave to you in the record will show that Ms. Saul took over my client's responsibilities. The other thing that... Other than the hiring and firing of nurses, duties other than the hiring and firing of nurses, you're saying... No, she took over all the responsibilities of nursing for my client in those facilities. In the other facilities, okay. And the main office building, the MOB. My client was regulated to the ambulatory surgical center, so there's a substantial amount of duties that were taken away from her. And I'll get into it on the alternative decision, which is that they claim that this job was created independent of her taking FMLA, because I think that argument defeats any argument that she was returning to an equivalent position upon her return from the FMLA leave. Counsel, with respect to the hiring and firing, I'm not sure I'm on the same page there. I'm says selects and hires employees according to established guidelines. Is that something different than what this discussion was? And second... On which job description are you referring to? Well, I think this is the director of nursing, the one where they struck out CEO and wrote in CMO. Correct. Right. Isn't this the one where they say... Yeah, on March 27th was handed to her. That was her prior job description, yes. Well, but isn't that... Like I said, this is your job description now. It's just you report to the CNO instead of the CEO. I understand, but that's not what the actual testimony was. That's what was handed to her. What was handed to her and what she was told and what was actually being done are two different things. Okay, so now you're saying, don't look at this, look at all these different things where people are talking. Correct. None of which, in effect, we actually know what happened because she resigned 20 minutes later. And I take it you're, at one point in your brief, it seems like you say at page 21, as soon as they hired Sohl, they had violated the FMLA. Page 21 says, this was an impossibility to go to the same duties once Huss created the CNO position. Oh, absolutely. Because they were taking away her duties. There was no way she could have returned to the position that she had before she took FMLA leave. And if you look at those deposition sites where you see what was actually done versus what was said, you will see that my client was stripped of substantial duties and responsibilities that she had prior to taking her FMLA leave regardless. And the point of that, when you see where it's scratched out as CNO, is further evidence of the fallacy of that job description that was handed to her when she came back on March 27th of 2017, is because it was inaccurate. So to reference that in support of a summary judgment is misplaced. Now, as far as the problem I'm having, and it may not be a real problem, that's what I'm asking, is there was certainly a lot of evidence that she was And the management is not entitled to make any changes of that sort. I mean, this is not a case in some of them where you change your duties. You used to be a vice president, now you're making copies. Sol would be doing some of the things that she had been doing, but she would have been doing at least according, as one can tell up to this point, a large proportion of what she had been doing before. And can you help me, what did she want to keep doing that she wasn't going to be able to do? What's the gravamen of the gripe here? She wanted to return to the same position or substantially same position that she had before in the duties. In doing every single thing that she was doing? Absolutely. And understanding that this is at the summary judgment level. And yes, there was evidence, which we dispute, that she was overloaded and they needed other people. And there's substantial record support for our position to dispute it. One, she got a raise on September 1st, 2016. Two, she got an evaluation where she scored out of 62 categories a perfect 10 in 55 of those 62 categories two weeks before she was going out on FMLA leave. And then they said that she exceeded her expectations on that. Didn't say she was doing a bad job about it. I agree with that. But then you look at the record and my client says, we agreed on a schedule. And what was that schedule? She said the job didn't take 40 hours and they agreed on a schedule where she would do clinicals on Monday through Thursday in the morning and she would do admin in the in deciding the summary judgment. You've saved some time for rebuttal, so we'll hear from you again. Thank you. Thank you. Good morning. Good morning. May it please the Court. Daniel Harrell for the appellees. This Court should affirm the trial court's entry of summary judgment for two reasons. First, the appellant cannot present any actual evidence that had she indeed returned to work as opposed to resigning her position, the job duty she would have had would have been substantially different from what she had before she took FMLA leave. And secondly, the appellant cannot refute the unrebutted testimony that the decision to create the chief nursing officer position occurred before and for reasons wholly unrelated to the appellant's FMLA leave, namely that the practice had grown, which was admitted by the appellant. Initially, you had a practice that was approximately two to four providers that went to over ten providers in a year and a half period. You have a Except wasn't wasn't that growth like while she was still there and then more than six months after she returned? There was growth that occurred during the time frame she was there. They went to almost double Ms. While she was there. While she was there, Ms. Simmons testifies that she hired over 20 additional nurses because of the growth that occurred in the practice. There was also evidence that the testimony of Ms. Simmons stated that they knew they were going to hire Dr. Dent in March of 2017 and incorporate his practice as well. I didn't. Maybe you can point me to where in the record it says this, but I didn't see where Ms. Simmons agreed that she knew of the plan to hire an administrator before she went out. She did not agree that. I'm not saying that she agreed that she knew they were going to hire the chief nursing officer. What I am saying is that she agreed that the growth of the practice indeed did. I guess I'm saying this poorly. The practice did grow considerably during the time frame that she was acting as the director of nursing, and there were plans that she was aware of of continued growth that would add additional responsibilities to what she already had. Importantly, So why isn't it a jury question, though, as to why isn't there a material issue of fact as to whether that determination was made to hire an administrator before or after she went out on leave? Because the unrefuted testimony, the unrebutted testimony from both Dr. Henghold and Ms. Huss, the CEO, was that in the fall of 2016, they made that very decision. But doesn't it seem, they also said they discussed it with her, I thought, and she says they didn't. So why doesn't that, I mean, why doesn't that create a material issue of fact on that issue? Well, I believe the discussion isn't necessarily the creation of that position, but the discussion was the Ms. Simmons' job duties and how she wanted to maintain her job duties moving forward. And one thing that the record is entirely clear about is that she wanted to maintain a clinical role where she participated in surgery. She did not want to take on a fully administrative role. Let me, Coach, what we're asked to decide here is whether there were sufficient conflicting accounts about what happened here to have a jury decide instead of a judge. And one thing that, you know, cries out to me is that, I mean, you say the decision had already been made to hire a chief nursing officer, but when they advertised the position, they called it director of nursing, which was Ms. Simmons' job title. Well, and you... Right? Correct? That is correct, Your Honor. I mean, I don't, I don't see how that supports your argument that there's, the evidence is unconflicted that they had already decided to hire somebody in another position if they advertise a position in the title that Ms. Simmons held. I believe, and you have to look at the overall timeline of how this occurred to understand how the process... Well, I know they did some things retroactively, but you agree with me that when they advertised for the job, they advertised it under the title that Ms. Simmons held while she was out on FMLA leave, right? Well, the advertisement was before she notified them of her intent to take FMLA leave. It was during a time frame in which she had told a Ms. Shearer, who was also an administrator of the practice, that she potentially was not going to come back, and then the testimony is also... But that might work for you if your client hadn't called her and said, we expect you back by such-and-such date, which occurred after all of this happened. So clearly, your client was expecting her to come back. I mean... Well, there was negotiations about a potential severance, and when she said, I'm not going to agree to it, they said, well, if you're not going to agree to it, then we expect you to come back to work. That has nothing to do with the FMLA issue. Was this during the time she was on paid leave before the FMLA leave? Before the practice was on notice that she was suffering from what she said was a serious medical condition. At the time that she says, I can't return to work because I'm having issues... But she was on leave for a while because of, let's say, other issues before the FMLA leave began. Is that fair? That's correct, Your Honor. And so that's how you justify the fact that they advertised to replace her? Yes, they advertised to replace her, and I believe it's either the very week or the following week after she goes out on this indefinite leave that has nothing to do with the FMLA. And there's a concern that she is not returning at all. Ms. Soule didn't respond to that advertisement. Ms. Soule was sought out directly by Cindy Huss because they had worked together before. And in the interview process, while Ms. Soule was told, we have a director of nursing duties that need to be done right now because our director of nursing is not with us. We intend, and Ms. Huss specifically told her, we intend to have this higher level administrative position eventually, which is what we are looking to have you do ultimately. And there's no dispute that that occurred. Can I ask you some questions about the record as far as Ms. Simmons' duties before she left versus after? Sure. Would you respond to Ms. Simmons' testimony that Ms. Soule took over her prior duties in the following respects? That Simmons testified that she assigned and oversaw staffing of nurses, and that became Soule's responsibility. That Ms. Simmons created education materials for physicians and staff, and Ms. Soule took over staff education and development. That Ms. Simmons oversaw inventory, and that became Ms. Soule's responsibility. And that Ms. Simmons ensured that Hanghold, PA, was compliant with federal and state regulations, and Ms. Soule took over that responsibility. Is there any material issue of fact with respect to any of those three things? Well, you have to look at— Sorry, four things. Sure, and I think it's important to look at what happened because the questions asked to Ms. Soule are, what are your job duties now, several months later in a deposition? What do you do now? Not what would have happened had Ms. Simmons returned to work, and that's a critical point here because what was occurring was Ms. Simmons wanted to come back to work. They told her, same pay, same responsibilities. Come back. We'll talk about it. She comes in for a 20-minute meeting, decides unilaterally that I don't believe this is the same position, goes and sees her lawyer, and then via text message quits. So we have no evidence. There's no evidence, and the burden falls on the appellant to prove a prima facie case that the job indeed was different. You know, my notes here say that Ms. Soule testified in her deposition that she would have kept some of the responsibilities rather than giving them back to Ms. Simmons had Ms. Simmons come back. Is that right? And if you look at that testimony, and I believe the testimony is—occurs in the appendix around—sorry, one second, I want to make sure I get this correct—in the appendix around 850 to 860, there's more than just this one line that's cited by Ms. Simmons in her brief. The line is that, yes, they would discuss a potential delegation of duties, but if you go further into that testimony, Ms. Soule is asked directly with regards to the job duties that she maintained beforehand, would she have—can you say that she wouldn't have done all these? She says, no, I believe it's possible that we would have set it up where she would have done the majority of these things. But she also said it was possible that Ms. Simmons' responsibilities would change, didn't she? She did, but again, we're left with a scenario where it's the appellant's burden to prove that there was actually change to her job. Yeah, I mean, but to get past summary judgment, we credit her version. But her version is based off of pure speculation and conjecture as to what she believes would have happened had she returned. Well, but I mean, it seems to me that Ms. Soule agreed with her that, you know, at least for the purposes of a summary judgment evaluation, that it was possible that Ms. Simmons' responsibilities would change and that Ms. Soule would have kept some of the responsibilities for herself. The answer to my—I mean, I'm not— I understand. Why is that a dispute of fact for a jury to decide? Ms. Soule's testimony is what she understood in a hypothetical scenario in which Ms. Simmons actually returned to work. Well, I mean, that's true in every summary judgment setting. I mean, that's why it goes to a jury, right? If there's a dispute of facts about what the plan was, then a jury decides it instead of a judge, right? Well, I disagree, Your Honor. I think looking at the job descriptions, it reflects that. And, I mean, again, the case law is clear that virtually identical means substantially similar. It doesn't mean that a practice doesn't have the ability to adjust things somewhat. I believe if you look at this testimony of Ms. Soule, who's talking about what her understanding of how they would have operated together, a scenario which didn't happen, ultimately you're left with a situation where the idea that she was not having the same job responsibilities is based off of speculation because she didn't return. What is in the district court's order, Judge Rogers says, there's nothing in the record to suggest that the Director of Nursing and the Chief Nursing Officer couldn't share some responsibilities. What's, I mean, that's kind of a finding of fact, isn't it? That they could have shared responsibilities and that the judge is deciding that here. Well, I believe that under the FMLA, though, the substantially similar requirement doesn't, is not, it's not, you have to come back to the duties that are absolutely identical to what you had beforehand. And if there's reason for. Yeah, but, I mean, share what? Share what responsibilities? I mean. We don't know because Ms. Simmons quit. And that's, that's the problem with, with the appellant's case. She has a duty as part of her burden to prove a prima facie case that the job was going to be different to submit actual evidence that her job duties changed. But what, what's the, what's the way these FMLA cases would work in the sense that she returns to work and, you know, on day one she does certain things and on day two she says, I want to do X, and they say, no, Ms. Soule's going to do that from now on. Would she then file an FMLA claim when she had enough of such things of duties that I wanted to do that they've taken away? Would that be the way from your point of view it should have worked? My position, Your Honor, is that had she returned to work, I don't think we'd be here because one of two things would have happened. Either she would have gone back and would have found out that indeed the job was substantially similar and she kept most of her duties, which her job description that was given to her supports, or she would have found out that, no, she thinks that it's different duties, but we're not in that position. Well, you might have been here, but that's what I just, I thought I just asked, counsel, is that we'd be here if she claimed that, okay, I wanted to do this, they wouldn't let me do it. I wanted to do that, they took it away from me. Isn't that, I mean, am I right about that's the way FMLA claims can work, or am I wrong in practice? Your Honor, I believe you're correct in that. Had she returned to work and had, and there was issues that she believed rendered the job not substantially similar, that at that point in time— I mean, that's not an impossible or an implausible way this worked. I mean, there's tension in this room amongst all these people, right? I mean, that's a fair reading of the record. And so it's certainly conceivable that's what could have happened. It's not, you know, we don't take it as gospel that you guys are always going to satisfy her. Understood, Your Honor. And I think the, I think you're correct in that, you know, in that, you know, that is a possibility. But again, that's not the record of what actually happened. And at the same time, I take it your argument on the other side would be, you know, if she managed eight facilities and they said, well, you're only going to manage seven, you would say, well, that's a de minimis change. That's correct, Your Honor. And as far as, you know, the idea of what Ms. Soles testified as to what duties she did, I think looking at that testimony as to what she's being asked, what she's being asked is, here we are seven months later in a deposition, what are you doing right now? And the practice after Ms. Simmons refuses to return and resigns her position has to adjust. And Ms. Soles is a person that has the capability of taking on some of those duties at that point in time. They also brought in two additional people to manage the MOB and the ASC. And the evidence there suggests that the practice indeed made efforts to do the director of nursing responsibilities, which are critically important to the practice. You're talking about accreditation issues, licensing, making sure that they're compliant with the state and federal regulations. And so they had to do those things. And Ms. Soles being in a position that was going to be — that no doubt was going to be similar to, at a higher, more strategic planning level, the director of nursing position, it's — she's the obvious person to take that on once Ms. Simmons resigns her employment. But you can't say because she did those things after Ms. Simmons quits. That's evidence as to what would happen had Ms. Simmons actually returned. I mean, this case turns entirely on the concept of the appellant has the burden to prove her prima facie case. Here, she sets up a scenario — Can I just — I'm sorry, you're into your windup, but I just want to make sure I've got the timeframe back. So Ms. Soles was hired into the job in March.  Then Ms. Simmons comes back on the 10th of March. And then on March 27th, Ms. Soles' job was re-designated to another title that didn't conflict with Ms. Simmons. Have I got that wrong? Yes, Your Honor. That is not accurate. Okay. Ms. — I know they — can I just continue with my — Doesn't come back on the 10th, right? Ms. Simmons does not come back, frankly, ever. That's when she asks about it. Okay. She asks about it. And then you do it retroactively. You re-designate Ms. Soles' title to be a different title than Ms. Simmons. Sure. And we make no claims that she wasn't performing the director of nursing position. The duties that go along with that position while Ms. Simmons was out, somebody had to, and she was the person that was brought in to cover that position and to potentially elevate — You advertised for it. Well, and we did advertise for that position at the time that Ms. Simmons had suggested that potentially she wasn't going to return at all. Ms. Soles did not respond to that advertisement. She specifically was sought out by Ms. Huss, who had worked with her previously. Is there any evidence about why the job was renamed retroactively? There is not in the record. I believe Ms. Huss says that they're working on the job description during the time frame that it occurred — that they knew Ms. Simmons was coming back and that, you know, they finished it on the day that she was coming — that she was supposed to come back to work but instead resigned. Okay. That's helpful. Thank you. Thank you, Your Honors. If I may answer your question regarding what Ms. Soles testified to. It's at A427-7 at page 53 and 54. The question wasn't asked what her current duties was. Question was, even though you did not discuss it, is it your understanding that she would have been your subordinate with respect to all these responsibilities? Answer, my understanding is she would report to me and we would have gone through and decided what I was going to delegate to her to direct report to me. Question, correct or answer? Obviously, I can't do all of it. Question, and you would not have delegated all of it. Answer, right. Some of it I would have kept to myself and some of it I would have delegated to her. So, that in itself creates an issue of fact. And there's a reason why, if you look at Apelli's brief, they cite to Ms. Soles' deposition only one time and it's for when she started, which was March 6th of 2017, after they were on record that my client needed FMLA leave, which is important. The second thing that I wanted to point out as an issue of fact is you can go look at Mrs. Huss' deposition testimony as far as the CEO. She asked, what does the CNO do? And at page, appendix 2, 27-4, at page 18, I'm sorry, at page 68, she testifies, I'm sorry, I got the wrong site. She testifies as to the distinction between the CNO where the CNO took over all the outlying offices in the MOB office, substantially reducing my client's testimony. As to the issue of fact, as to whether they made the decision before, the court can look to the record at A2. Again, this is Mrs. Huss' testimony, the CEO, 27-4 at page 52. When she asked about the job or maybe hiring an additional position with Dr. Hanghold, this is what she said his response was. He said, no, I promised her she didn't have to leave the OR if she took this position. So for them to say the decision was made when Mrs. Huss, in her deposition testimony, says, when we were discussing it, Dr. Hanghold, who owns the practice, said, no, we're not doing it. Then we go to — I'm sorry, the it is taking her out of the OR? No, taking, delegating or hiring a new person to do these administrative positions, which gets to the earlier point that — So you're saying Hanghold said, we're not going to hire a new administrator? Yeah, no. I mean, that's the deposition testimony. Then you look at their argument, and this gets back to what I was saying earlier. They want to argue on the one hand that the reason for this new position had nothing to do with her FMLA and the decision was made before she went on FMLA. Why? Because Mrs. Huss says, allegedly, it was too much for one person to do. That's the testimony. Yet, you see the raise on September 1, 2016. You see the evaluation on December 15, 2017, that contradict those. And if that was the case, then by necessity, my client would not have been coming back to the job that she was doing beforehand if that was the case. And we dispute that. And why do we dispute that the decision was not made, and there was no decision made before the FMLA leave? We pointed out the raise that she got on September 1, 2016, the evaluation she got on December 12, 2017, the fact that there was no advertisement for the position after September 1, 2017, all the way through and even after my client said, hey, I'm coming back from my FMLA leave. So, Ms. Soule. And the date she said that was on March 10th. Is that right? No, she indicated she was coming. February. I can give you the exact date. Well, I thought I could give you the exact date. But March 10th was the date that she was ready to return to work. Yes. Wasn't it February 14th that her counsel said that she was not resigning and had no plans? Correct, but not resigning, but that's when she wanted the FMLA. On March 10th, you're correct. On March 10th, she says, I'm ready to return back to work, and instead they give her the return to work forms to fill out. Right, which she does, and then she starts on the 27th. Which is a good point that, a good question, because even though they knew on March 10th she was returning, they kept Ms. Soule in the same director of nursing position that she hired into for two weeks. They didn't change, create the job description until the day my client was scheduled to come in on March 27th. They then say, come up with an excuse for retroactively calling it that she was hired back on March 6th in the CNO position when, in fact, she was not. Then you have the email exchange leading up to the meeting of the 27th between my client and Ms. Huss, the CEO, where she asks, hey, what job am I coming back to? I hear you hired a DON, which is my position. What does Ms. Huss say? She lies. She says, we didn't hire a DON, we hired a CNO, which we know from the record is not true because Ms. Soule testified repeatedly. When I got called, it was for the DON position. When I interviewed, it was for the DON position. There was no discussion about this higher level administrator. There was no discussion about strategic planning or budgeting or things. And then when you look at her job offer, what does her job offer? Her job offer, her title is director of the Ambulatory Surgical Center and Nursing. The job my client had. There is enough factual dispute here that summary judgment should not have been granted and this should be allowed to be decided by a jury. Thank you so much. We appreciate the presentation. That does it for this morning. Court is in recess until 9 o'clock tomorrow morning. Thank you.